**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:25-cr-60249-LEIBOWITZ**

**UNITED STATES OF AMERICA,**

*v.*

**CHELSEA MICHELLE ANN COX,**

*Defendant.*
_______________________________________/

**MEMORANDUM OPINION AND ORDER**
**ON DEFENDANT'S MOTION TO DISMISS THE INFORMATION**

This is an unusual criminal case. It rests upon a forty-year-old federal statute, 18 U.S.C. § 611, that prohibits the act of voting in a federal election by a non-U.S. citizen. Until very recently, no federal court has been presented with the following question about that statute: Did Congress have Constitutional authority to enact it?[1] That's unusual, all by itself.

But this case is even more unusual than that, because the Government's principal defense of the statute's constitutionality invokes a single Supreme Court case that is very, very weak. Let me say that a different way. The leading case cited by the Government to uphold the statute is of "minimal precedential value" (that's not my characterization, it's Justice Scalia's; we'll get to that), and the application of other binding precedent shows that the Government's leading case simply does not control this one. So why does the Government lead with such a weak hand? Because it's the best hand it can play. And why is that? Because the text, structure, and original public meaning of the Constitution show that *Congress does not have the constitutional power to enact this statute.*

[1] A handful of district courts have recently been presented with this issue of first impression. The Government has cited three similar recent challenges to the statute pending in the Southern District of Florida (all filed in 2026), and two similar challenges in the Western District of Wisconsin (one filed in 2025 and one filed in 2026). [ECF No. 41 at 7].

The best reading of the actual statute that underpins this criminal case yields an inescapable conclusion: 18 U.S.C. § 611 is a voter qualification statute, and the Constitution does not authorize Congress to legislate voter qualifications for federal elections. Except for very specific constitutional provisions (that cannot support this statute; we will go through them), Congress has no power to say *who can* vote or *who cannot* vote in federal elections—that foundational power is reserved for the States, and limits Congress.

Some legal principles are so fundamental that they form American constitutional bedrock, and this case reveals a big one: When you're prosecuted based on a law that Congress did not have the authority to pass, the prosecution cannot stand. That principle in federal law harkens back to cases like *Marbury v. Madison*, 5 U.S. 137, 180 (1803), and *United States v. Hudson*, 11 U.S. 32, 34 (1812), and has had explicit and unbroken support in criminal cases since *Ex Parte Siebold*, 100 U.S. 371, 376–77 (1879) ("An unconstitutional law is void, and is as no law. An offence created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment."). The principle is so fundamental that it even predates our constitutional republic; it lies at the very heart of our constitutional heritage. *See, e.g.*, *Bayard v. Singleton*, 1 N.C. 5, 9–10 (1787) (striking down a legislative act as unconstitutional and holding that a court cannot enforce an unconstitutional law in any type of proceeding). This principle acts as a shield for every person facing criminal prosecution in the United States, citizen and non-citizen alike. That shield protects the Defendant here, and none of the Government's arguments break through it.

After careful consideration, the Court concludes that Section 611 is unconstitutional as applied to the Defendant. Chelsea Cox cannot be prosecuted for an alleged violation of an unconstitutional statute.

## BACKGROUND

The United States Government accuses Cox of knowingly voting in a federal election in Broward County on October 29, 2020, fully aware that she was not a United States citizen. [ECF No. 1]. On October 22, 2025, the Government charged her in a one-count Information for a misdemeanor violation of 18 U.S.C. § 611. [*Id.*].

Section 611 states, in relevant part:

> (a) It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless—
>
> (1) the election is held partly for some other purpose;
>
> (2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and
>
> (3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.
>
> (b) Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.

18 U.S.C. § 611(a)–(b).

After Cox first moved to dismiss the Information ("the Motion") and the Government responded, [*see* ECF Nos. 30, 32], the Court ordered supplemental briefing from the parties and appointed *amicus curiae* to address the single issue of law presented by the Motion, which appears to be a matter of first impression in this Circuit and beyond:[2] "Did Congress have the constitutional

---

[2] The Eleventh Circuit has upheld Section 611 previously, but only in a case that challenged the statute on due process and Fifth Amendment grounds. *United States v. Knight*, 490 F.3d 1268, 1272 (11th Cir. 2007) ("Section 611 is a general intent crime. It is not unconstitutional merely because the congressional drafters did not specifically articulate a mens rea. There was also no constitutional violation in the grand jury instructions."). *Knight* did not present the issue the Court confronts here.

authority to enact Title 18, United States Code, Section 611, the statute the Defendant is charged with violating?" [ECF Nos. 35, 37]. After another full round of briefing, counsel for the parties and *amicus* presented oral argument on September 15, 2026. [ECF Nos. 61, 62].[3]

**STANDARD OF REVIEW**

Let's set the table quickly before we start to eat. Rule 12(b)(1) of the Federal Rules of Criminal Procedure allows a defendant to raise in a pretrial motion "any defense" that can be decided "without a trial on the merits." Fed. R. Crim. P. 12(b)(1); *see also United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (holding that in deciding a pretrial motion to dismiss, "a district court is limited to reviewing the *face* of the indictment") (emphasis in original). When a pretrial motion to dismiss raises a "pure question of law," the Court may decide it so long as "trial of the facts surrounding the commission of the alleged offense would be of no assistance." *United States v. Ayala*, 711 F. Supp. 3d 1333, 1338 (M.D. Fla. 2024) (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)); *see also United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987) ("[A] court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.") (citations omitted). If the Court finds that a charging statute is unconstitutional, the charging document may be dismissed. *See Torkington*, 812 F.2d at 1354 ("Under [Rule 12(b)] an indictment may be dismissed where there is an infirmity of law in the prosecution."); *see also Siebold*, 100 U.S. at 376 ("An unconstitutional law is void, and is as no law. An offence created by it is not a crime.").

---

3 The Court sincerely thanks Paul D. Clement and Chadwick J. Harper for undertaking the appointment as *amicus curiae*. Counsel performed their duty *pro bono*, and they have acted in the finest tradition of the federal bar. Their Memorandum [ECF No. 46] and participation at the hearing provided important supplemental argument and legal authority regarding the constitutionality of an Act of Congress. *Amicus* was not appointed to assist either party, as both were well-represented by experienced counsel. Instead, *amicus* was appointed only to provide a thorough and candid view of the relevant legal authorities and their application to the Motion.

## DISCUSSION

The Motion raises a pure issue of law. No determination of fact is needed here; one can assume that the Defendant committed every element of the crime established by Section 611, and the answer is the same. The sole issue presented is whether 18 U.S.C. § 611 is unconstitutional as applied to Cox because it is a voter qualification statute that Congress has no power to enact.[4]

The answer proceeds in three parts. First, the Court considers the Government's principal argument—that *Oregon v. Mitchell*, 400 U.S. 112 (1970), controls the outcome here and sustains Section 611's constitutionality. Here's the bottom line on that again: *Mitchell* does not control this case; the Government overreads it. Second, the Court concludes that the Constitution grants the States exclusive authority to enact voter qualification laws and forbids the federal government from doing so. That conclusion has overwhelming support from the plain text and structure of the Constitution, the original understanding of the people who ratified it, and Supreme Court and Eleventh Circuit cases. Third, the Court considers whether any of Congress's enumerated powers nonetheless authorize it to enact Section 611. The Government offers several bundles of power to consider,[5] but they don't save the statute either.

---

[4] Cox's Motion first appeared to be a facial challenge to the statute. [ECF No. 30 at 1]. On September 15, 2026, the Court granted Cox's application to supplement her motion to dismiss with an as-applied challenge. [ECF No. 62 4:20–25]. The Government did not object to adding the as-applied challenge, and this Order only considers the as-applied challenge and declines to consider the facial challenge. [*Id.* 4:16–22; ECF No. 47 at 3]. A facial challenge to the constitutionality of a statute requires the movant to "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As *amicus* pointed out—and as Cox later agreed—Section 611 "by its terms reaches federal elections in the District of Columbia," and "[t]here is no apparent reason that Congress' plenary authority over the District would not allow Congress to prohibit alien voting." [ECF No. 46 at 38 (citing U.S. Const. art. I, § 8, cl. 17); ECF No. 47 at 2].

[5] The Government's initial response to the Motion focused only on Congress's power under the Elections Clause and the Supreme Court's holding in *Oregon v. Mitchell*, 400 U.S. 112 (1970). [ECF No. 32]. At a status conference on May 15, 2026, the Court ordered further briefing from the parties on Congress's authority to enact Section 611, [ECF No. 35], and on June 1, 2026, appointed *amicus* to address the same issue, [ECF No. 37], and allowed the parties to respond and offer supplemental briefing.

## I. *Oregon v. Mitchell* Does Not Resolve the Issue Presented

The Government's principal argument is that the Court is bound by the Supreme Court's holding in *Oregon v. Mitchell*, 400 U.S. 112 (1970). Stretching broadly, the Government presents the holding in *Mitchell* to mean "at a minimum . . . that Congress may set voter qualifications in federal but not state elections." [ECF No. 51 at 7; *see also* ECF No. 44 at 1–2 (arguing *Mitchell* allows Congress to regulate "who" can vote in federal elections)]. If the Court agrees with the Government's view that this is the binding holding in *Mitchell*, then this case ends here—Congress can regulate *who* may vote in federal elections, including by excluding non-citizens, and Section 611 is constitutional. But Cox counters with a broad swipe too, claiming that "there is no precedential opinion in *Mitchell* that commands the force of law." [ECF No. 34 at 4; *see also* ECF No. 45 at 2 ("[T]here is no precedent in *Mitchell* to overrule, given the absence of a majority rationale.")]. To resolve this dispute, the Court analyzes the decision in *Mitchell.*

The Supreme Court in *Mitchell* was tasked with deciding the constitutionality of the Voting Rights Act Amendments of 1970. *Mitchell* addressed a direct clash of federal and state power; four States sued U.S. Attorney General John Mitchell to enjoin enforcement of the 1970 Amendments, and the Supreme Court exercised its original jurisdiction to hear the case directly. *Mitchell*, 400 U.S. at 117 n.1. The States resisted compliance with three provisions of the Act, which (1) lowered the minimum age of voters in state and federal elections from 21 to 18; (2) barred the use of literacy tests in all elections, state and federal, for a five-year period; and (3) prohibited States from disqualifying voters in national elections for presidential and vice-presidential electors because of a failure to meet state residency requirements. *Id.* at 117.

In a splintered set of opinions, the *Mitchell* Court ruled that the provision lowering the voting age to 18 was constitutional and enforceable for federal elections, but not for state and local elections. *Id.* at 118. Justice Black's opinion ("announcing the judgments of the Court in an opinion expressing

his own view of the cases") turned on his analysis of Article I, § 4 (the "Elections Clause"). *Id.* at 117, 119–24. Justice Black expressed the view that the Elections Clause allowed Congress to set the voting age for federal elections, but not for state or local elections. *Id.* at 117–18. The other four Justices comprising the majority judgment upholding the voting-age provision—Justices Douglas, Brennan, White, and Marshall—based their decision on the Fourteenth Amendment. *Id.* at 144 (op. of Douglas, J.), 240 (op. of Brennan, White, and Marshall, JJ.).

Here's the weird part, and it has real bite for our case: *None* of the rationales contained in the opinions that upheld the voting-age provision in *Mitchell* were supported by a majority of the Supreme Court. Importantly, five Justices *rejected* the view that the Elections Clause empowered Congress to regulate voter qualifications in federal elections. *Id.* at 143 (op. of Douglas, J.), 210 (op. of Harlan, J.), 288 (op. of Stewart, Burger, and Blackmun, JJ.). Equally importantly, five Justices also *rejected* the view that the Fourteenth Amendment empowered Congress to lower the voting age. *See id.* at 124–30 (op. of Black, J.), 155 (op. of Harlan, J.), 293–94 (op. of Stewart, Burger, Blackmun, JJ.). The *Mitchell* majority judgment on the voting-age provision, therefore, was formed by combining two divergent rationales: one based on the Elections Clause and one based on the Fourteenth Amendment. So while there were five votes for the *result*—upholding the voting-age provision for federal elections—there were explicit *majorities* of the Supreme Court that *rejected* each of the *rationales* (the Elections Clause and the Fourteenth Amendment) that allowed for that very result. Quite unusual, and it raises the question: What is the precedential effect of *Mitchell* in that kind of situation?

### A. The *Marks* Doctrine Does Not Support the Government's View of *Mitchell*

To determine the answer to that, the Court must turn to other precedent first, starting with the guidance set forth by the Supreme Court in *Marks v. United States*, 430 U.S. 188 (1977). In *Marks*, the Supreme Court held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as *that*

*position taken by those Members who concurred in the judgments on the narrowest grounds*." *Id.* at 193 (citation omitted) (emphasis added). As it turns out, however, in cases like *Mitchell*, "asking which of two opinions is narrower is akin to asking, 'Which is taller, left or right?'" *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1337 (11th Cir. 2015).

The Eleventh Circuit's clearest guidance on *Marks* provides that the "narrowest grounds" is the "less far-reaching opinion." *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1247 (11th Cir. 2001); *see also United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007); *United States v. Hughes*, 849 F.3d 1008, 1012 (11th Cir. 2017), *rev'd and remanded*, 584 U.S. 675 (2018). "*Marks*' emphasis on the Court's judgment demonstrates that it is the ultimate vote of five Justices that is important in determining the binding effect of a splintered Supreme Court opinion." *Hughes*, 849 F.3d at 1014 (cleaned up). *Marks* requires the Court to "find a legal standard which, when applied, will necessarily produce *results* with which a majority of the Court from that case would agree." *Id.* (quoting *Davis*, 825 F.3d at 1035) (emphasis in original).[6]

Applying this guidance, the Eleventh Circuit sometimes surveys the opinions of the Justices to decide which among them is narrower. *See, e.g.*, *id.* at 1013 ("Justice Sotomayor's opinion is the less far-reaching common ground"); *Robison*, 505 F.3d at 1222 (deciding that a concurrence by Justice Kennedy provided the governing test). The Eleventh Circuit seems to use that approach when the "opinions agree on the broader principle" embedded in the opinions that produced the majority result. *See Hughes*, 849 F.3d at 1013; *Robison*, 505 F.3d at 1221–22 (explaining that Justice Kennedy's concurrence rejected certain requirements of the plurality's test).

---

[6] In determining the less far-reaching opinion, the Eleventh Circuit looks to the Supreme Court Justices who concurred in the judgment—not those in dissent. *Robison*, 505 F.3d at 1221; *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1054 (11th Cir. 2008). The Court therefore does not consider the rationales of the dissenting votes in its analysis of *Mitchell*.

But in some cases, there is simply no broader legal principle that can be "narrowed" or made "less far-reaching" by any of the Justices; the competing rationales are incompatible with each other. *See Lisk*, 792 F.3d at 1331. When that happens, the law of this Circuit directs the Court not to select the opinion of one Justice or group of Justices—it says that the holding is limited to what all concurring Justices would agree upon, which often is the base result and nothing more. *See, e.g.*, *Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1523 (11th Cir. 1994), *aff'd sub nom.* 514 U.S. 280 (1995) (limiting Supreme Court precedent to its result because the rationales of the plurality and concurrence were at odds with each other).[7]

Two Eleventh Circuit cases demonstrate the point when *Marks* runs out, and what the Court is supposed to do when it does. Take *Johnson*, where the Eleventh Circuit analyzed the Supreme Court's splintered ruling in *Regents of University of California v. Bakke*, 438 U.S. 265 (1978). 263 F.3d at 1245. The defendants in *Johnson* argued that Justice Powell's opinion in *Bakke* supplied binding precedent—an opinion that the Eleventh Circuit described as "clearly identif[ying] diversity as a compelling interest that may be asserted by a university in defense of an admissions program that flexibly considers race as one of several factors in making admissions decisions." *Id.* at 1245–46. However, the Eleventh Circuit noted that "*[n]o* other Justice [] expressly endorsed that view" in *Bakke*, and the four concurring Justices "took an entirely different approach to the case." *Id.* at 1246 (emphasis in original).[8] The Eleventh Circuit emphasized that Justice Brennan did not even "consider

---

[7] In its response to the Memorandum of *amicus*, the Government cites only *Myrick* in its discussion of *Marks* and its Eleventh Circuit progeny. [ECF No. 51 at 7]. But *Myrick* cuts against the Government's argument here about *Mitchell*, *see* 13 F.3d at 1523 ("Because the rationales adopted by the plurality and Justice Kennedy are at odds with each other, the only holding in *Gade* is the result that OSHA pre-empts state laws which regulate in an area regulated by OSHA, regardless of whether the state law has an ancillary purpose."), as that decision cabined the holding in *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992), to its *result*, not any broader extension of one rationale.

[8] The Supreme Court later directly decided the issue, stating that "[i]n the wake of our fractured decision in *Bakke,* courts have struggled to discern whether Justice Powell's diversity rationale, set

whether student body diversity constituted a compelling interest sufficient to justify the university's discriminatory admissions policy," *id.*, and only supported Justice Powell's opinion "*so long as* the use of race to achieve an integrated student body *is necessitated by the lingering effects of past discrimination*," *id.* at 1248 (quoting *Bakke*, 438 U.S. at 326 n.1 (Brennan, J.)) (emphasis added in *Johnson*). Finding it "inescapable that no five Justices in *Bakke* expressly held that student body diversity is a compelling interest," the Eleventh Circuit held that "Justice Powell's opinion does not establish student body diversity as a compelling interest for purposes of this case." *Id.* at 1248–49.[9] Rather, the "less far-reaching" common ground between Justice Powell and Justice Brennan was, at best, that diversity was an "important" state interest "but not the kind of compelling interest that potentially might withstand even the strictest constitutional scrutiny," as Justice Powell suggested. *Id.* at 1247.[10]

---

forth in part of the opinion joined by no other Justice, is nonetheless binding precedent under *Marks*." *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 211 (2023) (citing *Grutter*, 539 U.S. at 325). However, the Supreme Court did "not find it necessary to decide whether Justice Powell's opinion is binding under *Marks*," noting "[i]t does not seem 'useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it.'" *Grutter*, 539 U.S. at 325 (citing *Nichols v. United States*, 511 U.S. 738, 745–46 (1994)).

[9] The Honorable Stanley Marcus was explicit in *Johnson* about the point when *Marks* loses its utility: "While it may be possible to speculate that all four of the Justices who joined Justice Brennan's opinion might have embraced treating student body diversity as a compelling interest even in the absence of a valid remedial purpose, that kind of speculation is inconsistent with *Marks*." 263 F.3d at 1248. Here, we cannot "speculate" that the concurring Justices would adopt Justice Black's rationale. Indeed, we don't even have the "possibility to speculate" for Justice Douglas, as we *know* he rejected Justice Black's rationale, *Mitchell*, 400 U.S. at 143, and we *know* Justice Brennan limited his holding to the Fourteenth Amendment analysis, *id.* at 231, 240. The Government's suggestion that *Marks* compels its broad, preferred holding in *Mitchell*, [ECF No. 51 at 7 (arguing *Mitchell* held "at a minimum . . . that Congress may set [any] voter qualifications in federal but not state elections")], both misreads *Marks* and overreads *Mitchell*.

[10] Despite concluding that Justice Powell's *Bakke* opinion was not binding precedent, the *Johnson* court ultimately did not reach "whether or when student body diversity may be a compelling interest for purposes of strict scrutiny review under the Equal Protection Clause of the Fourteenth Amendment" because it could otherwise hold that the university failed to show that its admissions policy was narrowly tailored. *Johnson*, 263 F.3d at 1251.

Or consider the Eleventh Circuit's analysis in *Somers v. United States*, 66 F.4th 890 (11th Cir. 2023). In *Somers*, our Circuit distilled the Supreme Court's holding on the Armed Career Criminal Act ("ACCA") in *Borden v. United States*, 593 U.S. 420 (2021). In *Borden*, "a divided Supreme Court held that the ACCA's elements clause 'does not include offenses that criminalize reckless conduct; it covers only offenses that require a *mens rea* of knowledge or intent.'" *Somers*, 66 F.4th at 896 (quoting *United States v. Carter*, 7 F.4th 1039, 1041 (11th Cir. 2021)). Four Justices "based this conclusion on the 'against another person' language in the ACCA; it reasoned that offenses with a *mens rea* of recklessness 'do not require, as ACCA does, the active employment of force against another person.'" *Id.* at 895 (quoting *Borden*, 593 U.S. at 445). Justice Thomas offered the fifth vote for the majority result, but based his decision on different language, explaining "that offenses with a *mens rea* of recklessness do not qualify under the ACCA because crimes that can be committed through mere recklessness do not have as an element the use of physical force because that phrase has a well-understood meaning applying only to intentional acts designed to cause harm." *Id.* (quoting *Borden*, 593 U.S. at 446 (Thomas, J., concurring)) (cleaned up). From these separate rationales, the Eleventh Circuit found that "the narrowest holding of the five-justice majority . . . was only that the elements clause excludes reckless conduct." *Id.* (citing *Borden*, 593 U.S. at 436 n.6). *Johnson* and *Somers* demonstrate that in certain fractured situations, the law of this Circuit requires the Court to read a case's holding as the narrowest *base result* with which a majority of the Justices agreed.

Perhaps it's a cosmic constitutional coincidence, but just as Justice Brennan's opinion limited Justice Powell's rationale in *Bakke* (as the *Johnson* panel saw it), Justice Brennan's opinion limited Justice Black's rationale in *Mitchell*, too. Justice Brennan's opinion in *Mitchell* was explicitly limited to voting-age qualifications and explicitly declined to extend its rationale to empower the federal government to regulate all voter qualifications, regardless of the nature of the qualification or the evidence to support the measure. 400 U.S. at 240 (op. of Brennan, White, and Marshall, JJ.) ("We are not faced with an

assertion of congressional power to regulate any and all aspects of state and federal elections, or even to make general rules for the determination of voter qualifications. . . . The single, narrow question presented by these cases is whether Congress was empowered to conclude, as it did, that citizens 18 to 21 years of age are not substantially less able."). Justice Black's Elections Clause rationale, by contrast, would result in nearly always finding that Congress can set any number of voter qualifications for federal elections—an obviously "more far reaching" result for the four Justices who based their *Mitchell* decision upon an application of the Fourteenth Amendment and explicitly cabined their rationale to the lowering of an existing voting-age minimum.[11]

A faithful application of *Marks* doctrine to *Mitchell* (including the Eleventh Circuit's own discussions of *Mitchell* itself, *see infra* Section I.B) does not support the Government's far-reaching contention that Congress may establish voter qualifications in federal elections writ large.[12] [*See* ECF

---

[11] There is an additional argument that potentially further weakens the force of the Government's overreading of *Mitchell*, but it is not necessary to add to the pile here. The Twenty-Sixth Amendment—ratified less than one year after the *Mitchell* decision—partially implemented the judgment of *Mitchell* on the voting-age provision, but also partially repudiated that judgment as well. *See* U.S. Const. amend. XXVI. Ratifying an Amendment under Article V to respond to a Supreme Court decision directly has happened only seven times in our Nation's history. That Amendment is "valid to all Intents and Purposes, as Part of this Constitution," that all federal courts are sworn to uphold, U.S. Const. art. V; *id.* art. VI, cl. 2. The Supreme Court has previously ruled in at least one of these rare circumstances that a pre-Amendment judicial ruling is legally nullified by the Amendment's ratification. *See, e.g.*, *Hollingsworth v. Virginia*, 3 U.S. 378, 382 (1798) (unanimously acknowledging that Eleventh Amendment eliminated jurisdiction granted by prior decision in *Chisholm v. Georgia*).

[12] Both *amicus* and the Government also point to a sentence from *Kusper v. Pontikes*, 414 U.S. 51 (1973), that the Government's suggests as support for its reading of *Mitchell*. [*See* ECF No. 46 at 29 ("With respect to elections to federal office . . . the Court has held that Congress has power to establish voter qualifications.") (quoting *Kusper*, 414 U.S. at 57 n.11); ECF No. 51 at 3 (same)]. *Amicus* disagrees with the Government's spin on *Kusper*, and this Court agrees with *amicus*. First, it is important to underscore that *Kusper* was decided before *Marks*, diminishing the contention that the single statement stands for the Supreme Court's view of what *Mitchell* held and binds. Second, the line from *Kusper* cited by the Government was a footnote to this sentence: "To be sure, administration of the electoral process is a matter the Constitution largely entrusts to the States." 414 U.S. at 57. Finally, the issue in *Kusper* was whether an Illinois election law violated a voter's "right of free political association protected by the First and Fourteenth Amendments"—not whether the federal government had authority to set voter qualifications or not. 414 U.S. at 60. The Court recognizes that Supreme Court

No. 44 at 1–2; ECF No. 51 at 7]. Neither does the Court's analysis hold that *Mitchell* has zero precedential value, as the Defendant urges. [ECF No. 34 at 4; ECF No. 45 at 2]. Rather, under *Marks* and its progeny, *Mitchell* is best construed as holding that Congress can regulate voting-age qualifications in federal elections. So construed, *Mitchell* does not control this case.[13]

### B. The Court Cannot Ignore Supreme Court and Eleventh Circuit Opinions Discussing *Mitchell* and Non-Citizen Voting

Subsequent decisions from the Supreme Court and the Eleventh Circuit further diminish *Mitchell*'s force here.

The parties spill a great deal of ink on how the Court should apply the Supreme Court's decision in *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1 (2013). In *ITCA*, the Supreme Court explained that "nothing in [the Constitution] lends itself to the view that voting qualifications in federal elections are to be set by Congress." *Id.* at 17. Congress may only "regulate *how* federal elections are held, but not *who* may vote in them." *Id.* at 16 (emphasis in original); *see also id.* at 16 n.8 (*Mitchell* is "of minimal precedential value"). Cox argues that the Supreme Court in *ITCA*

---

dicta can, at times, inform its analysis, *see infra* Section I.B, but this brief descriptive aside from *Kusper*—nestled in a one-sentence footnote in a First Amendment case—is not enough to give the Government's maximalist reading of *Mitchell* the force of law.

[13] While *Mitchell*'s rulings on the literacy test provision and the residency requirement provision undoubtedly maintain their force, they are not very salient here. [*See* ECF No. 46 at 30 n.12]. The *Mitchell* Court "unanimously upheld a nationwide ban on literacy tests and by an 8-1 margin upheld limitations on residency requirements in presidential elections." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1557 (11th Cir. 1984). Importantly, the residency requirements ruling stated that Congress could *prohibit States* from imposing the requirement, and no rationale commanded a majority in upholding the residency requirements either. The residency requirements ruling also introduced a crucial additional rationale well-recognized in other cases: the right to interstate travel. *See Mitchell*, 400 U.S. at 134 (op. of Black, J.) (relying on power to "regulate federal elections"), 150 (op. of Douglas, J.) (relying on Section 5 of the Fourteenth Amendment), 236 (op. of Brennan, White, and Marshall, JJ.) (relying on Section 5 of the Fourteenth Amendment), 285–87 (op. of Stewart, Burger, and Blackmun, JJ.) (relying on right to interstate travel and Necessary and Proper Clause). The statute here is not enforcement legislation against state action and cannot plausibly be stretched to claim any support from the right to interstate travel or its protection.

has "spoken clearly" on the issue at hand. [ECF No. 30 at 3]. The Government responds that because *ITCA* is "purely a statutory preemption case," Justice Scalia's discussion of *Mitchell* is "plainly dicta." [ECF No. 51 at 4–5].

In urging the Court to disregard Justice Scalia's analysis in *ITCA*, the Government is too dismissive of Supreme Court dicta. As the Eleventh Circuit has explained many times, "there is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (Carnes, J.); *United States v. Watkins*, 10 F.4th 1179, 1182 (11th Cir. 2021) (Martin and Carnes, JJ.) (same). When the Supreme Court's dicta "is well thought out, thoroughly reasoned, and carefully articulated analysis . . . describing the scope of one of its own decisions," it is not a "throw-away kind of dicta." *Schwab*, 451 F.3d at 1325.

Justice Scalia's developed analysis in *ITCA* provides exactly the kind of dicta that merits careful attention from the lower courts when no binding holding of the Supreme Court or Eleventh Circuit speaks to the issue at bar. Justice Scalia, joined by five other Justices, dedicated hundreds of words to reject the idea that Congress can generally set voting qualifications for federal elections.[14] *See ITCA*, 570 U.S. at 15–18. That analysis is particularly valuable to lower courts when making sense of *Mitchell*'s splintered rationales. And not only have members of the Supreme Court interpreted the limits and meaning of *Mitchell* and its progeny—Eleventh Circuit judges have too. *See Georgia v. Shafer*, 119 F.4th

---

[14] And the dissenting Justices in *ITCA* agreed on this fundamental point. *See ITCA*, 570 U.S. at 23 (Thomas, J., dissenting) ("I think that both the plain text and the history of the Voter Qualifications Clause, U.S. Const., Art. I, § 2, cl. 1, and the Seventeenth Amendment authorize States to determine the qualifications of voters in federal elections, which necessarily includes the related power to determine whether those qualifications are satisfied."); *id.* at 26 ("That language [of the various voter qualification clauses] is susceptible of only one interpretation: States have the authority to control who may vote in congressional elections so long as they do not establish special requirements that do not apply in elections for the state legislature. . . . Congressional legislation of voter qualifications was not part of the Framers' design.") (internal citations omitted); *id.* at 42 (Alito, J., dissenting) ("As the Court acknowledges, the Constitution reserves for the States the power to decide who is qualified to vote in federal elections.").

1317, 1325 n.5 (11th Cir. 2024) (Rosenbaum, J., concurring) (explaining that Justice Black's opinion "that Congress had broad regulatory authority over the appointment of Electors . . . . runs counter to the text, structure, and history of the Constitution, [and] did not receive any traction from the rest of the Court then . . . . Nor has it since.").

To be clear, the Court does not conclude or hold that *ITCA* controls its decision today. But it rejects the Government's suggestion that it completely disregard the Supreme Court's clear and recent analysis in *ITCA*, which concluded that *States* set voting qualifications for federal elections except for very specific carve-outs—and importantly, followed a long line of Supreme Court decisions that said the same.

The Government does not engage with other Supreme Court precedent suggesting that the States decide voting qualifications for federal elections. For example, as early as 1874, the Supreme Court noted that "citizenship has not in all cases been made a condition precedent to the enjoyment of the right of suffrage." *Minor v. Happersett*, 88 U.S. 162, 177–78 (1874) (holding Fourteenth Amendment did not confer suffrage upon women). *But see* U.S. Const. amend. XIX (prohibiting denial of right to vote on account of sex, effectively abrogating *Minor*). The Supreme Court went on to list multiple States that allowed non-citizen voting at the time. *Minor*, 88 U.S. at 177 (referencing Missouri, Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Minnesota, and Texas). The Supreme Court later confirmed that States may decide voting requirements related to citizenship when it commented that a "state might provide that persons of foreign birth could vote without being naturalized." *Pope v. Williams*, 193 U.S. 621, 632 (1904) (allowing States to require voters to be bona fide residents). *But cf. Dunn v. Blumstein*, 405 U.S. 330, 337 n.7, 344 (1972) (applying new test, under Equal Protection Clause, to state-imposed residency requirements). These are just two examples of Supreme Court decisions that suggest the States—and not the federal government—have the constitutional authority to set voter qualifications. *See also Katzenbach v. Morgan*, 384 U.S. 641, 647

(1966) (explaining that "the qualifications established by the States for voting for members of the most numerous branch of the state legislature also determine who may vote for United States Representatives and Senators"); *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) (noting the States have "the broadest power of determination" over the appointment of Presidential electors); *Bush v. Gore*, 531 U.S. 98, 104 (2000) (under Article II, § 1, cl. 2, "the state legislature's power to select the manner for appointing electors is plenary"). Indeed, the Eleventh Circuit itself has not questioned Florida's authority to set voter qualifications. *See, e.g.*, *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1234–35 (11th Cir. 2005) (upholding Florida's felon disenfranchisement law, with variants of the law dating back to 1868).

For all these reasons, the holding in *Mitchell* does not control this case (which involves whether Section 611 is a voter qualification statute involving citizenship and alienage), and the Court must therefore determine whether Congress has the constitutional authority to enact Section 611 anew.

## II. The Constitution Grants the States—and not the Federal Government—the General Authority to Pass Voter Qualification Laws

The Constitution commits to the States, and the States alone, the general power to set voter qualifications in federal elections. This is clear from both the text of the document and the debates at the Constitutional Convention in 1787.

"The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning as originally understood." *United States v. Rahimi*, 602 U.S. 680, 715 (2024) (Kavanaugh, J., concurring); *see also Lake Cty. v. Rollins*, 130 U.S. 662, 670 (1889) ("[W]hen the text of a constitutional provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument."). When "[t]he plain text of the Constitution" is clear, the Court "must follow it." *Johnson*, 405 F.3d at 1228 n.29.

Three clauses in the Constitution address the power to establish voter qualifications for federal elections. Article I says that the voters in elections for the House of Representatives "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature," U.S. Const. art. I, § 2, cl. 1, and the Seventeenth Amendment, enacted in 1913, uses the same rule for the Senate, *id.* amend. XVII ("The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures."). Article II, which addresses Presidential elections, says "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of trust or Profit under the United States, shall be appointed an Elector." *Id.* art. II, § 1, cl. 2.

Read together, these clauses—the "Voter Qualification Clauses"—are "susceptible of only one interpretation": The States have sole authority to set voter qualifications. *ITCA*, 570 U.S. at 26 (Thomas, J., dissenting); *see also Mitchell*, 400 U.S. at 210 (Harlan, J., concurring in part and dissenting in part) ("It is difficult to see how words could be clearer in stating what Congress can control and what it cannot control."). In federal congressional elections, voters' qualifications are a function of each State's rules. *See Katzenbach*, 384 U.S. at 647. And in Presidential elections, the States have the prerogative to establish whatever rules for selecting electors they see fit. *See Bush*, 531 U.S. at 104.

This reading of the Voter Qualification Clauses is reinforced by a foundational principle of our constitutional order. "When the States ratified the Federal Constitution, the people of each State acquiesced in the transfer of limited power to the Federal Government." *Chiafalo v. Washington*, 591 U.S. 578, 605 (2020) (Thomas, J., concurring).[15] That acquiescence was not unconditional. Since the

---

[15] *See also id.* at 589–90 (Kagan, J., writing for the Court) ("Article II, § 1's appointments power *gives the States far-reaching authority over presidential electors*, absent some other constitutional constraint. As noted earlier, each State may appoint electors 'in such Manner as the Legislature thereof may direct.'

Founding, it has been understood that the powers of the federal government are "defined, and limited," *Marbury*, 5 U.S. at 176, while the powers of the States are "numerous and indefinite," The Federalist No. 45, at 328 (J. Madison) (B. Wright ed., 1961); *see also* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."); *New York v. United States*, 505 U.S. 144, 156 (1992) ("[The Tenth Amendment] is a mere affirmation of what, upon any just reasoning, is a necessary rule of interpreting the constitution. Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities.") (quoting 3 J. Story, *Commentaries on the Constitution of the United States* 752 (1833)). In addition to that fundamental background rule, the Framers took the extra step to address directly the matter of voter qualifications and assigned that authority to the States—thus denying it to the federal government.

As Cox and *amicus* note, that design was no accident. Motivated by an "aversion to concentrated power," the Framers rejected a proposal raised at the Constitutional Convention that would have assigned the federal government the power to set voter qualifications for federal elections. [ECF No. 46 at 33 (quoting *ITCA*, 570 U.S. at 17)]. In response to that proposal, Oliver Ellsworth (framer, Senator, and third Chief Justice of the United States) argued "[t]he States are the best Judges of the circumstances and temper of their own people." 2 *The Records of the Federal Convention of 1787* 201 (M. Farrand ed., 1911). Virginia framer George Mason pushed back against the proposal too, arguing that the "power to alter the qualifications would be a dangerous [one] in the hands of the [federal] Legislature." *Id.* at 202. James Madison also objected, *see id.* at 203, and elsewhere argued that the power to qualify electors was "fundamental" to the Republican form of government, and should not be entrusted to the federal government, lest it use that power to "subvert the Constitution,"

---

Art. II, § 1, cl. 2[.] . . . This Court has described that clause as *'conveying the broadest power of determination' over who becomes an elector*.") (internal footnotes and citations omitted) (emphasis added).

*id.* at 249–50. Thus, the proposal allowing the federal government to set voter qualifications for federal elections was rejected, and Article I, § 2, cl. 1, was ratified as we know it today. *Id.* at 206.[16]

Almost one hundred years later, the issue of federal authority over elections was raised again during debates over the Reconstruction Amendments, but a proposal that would have "granted Congress plenary control over the franchise" was rejected then too. Jeffrey Rosen, *Divided Suffrage*, 12 Const. Comment. 199, 200 (1995). Other constitutional provisions addressing the right to vote haven't changed the balance of power, either. The Twenty-Sixth Amendment,[17] which was passed in response to *Mitchell*, shares a similar textual construction with three other Amendments: the Fifteenth Amendment,[18] the Nineteenth Amendment,[19] and the Twenty-Fourth Amendment.[20] These Amendments establish only that the right to vote cannot be denied or abridged on account of a specific characteristic or condition of the voter (race, color, previous condition of servitude, sex, failure to pay

---

[16] Even though it was ratified in 1913, the Seventeenth Amendment uses the exact same language as Article I, § 2, cl. 1, so it is best understood to adopt the exact same rule. *Cf. Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1158 (11th Cir. 2021) ("[I]f a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort, . . . they are to be understood according to that construction.") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 54, at 322 (2012)).

[17] For convenience, here's the text of the Twenty-Sixth Amendment: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI.

[18] "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV.

[19] "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex." U.S. Const. amend. XIX.

[20] "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV.

a poll tax, or age). The Government does not argue that any of these Amendments authorize Congress to enact Section 611. Given the clear and specific language of these Amendments, it is clear they do not alter the Framers' original design.[21] The States alone have constitutional authority to set voter qualifications in federal elections.

**III. Section 611 Is a Voter Qualification Law**

We now turn to the statute itself. Cox and *amicus* argue Section 611 is a voter qualification law. [ECF Nos. 30 at 9–10; 42 at 6–7; 46 at 26–28]. The Government hasn't really disputed this point, and for good reason: On its face, Section 611 dictates *who may vote* in federal elections, and is therefore a voter qualification law. *See ITCA*, 570 U.S. at 16.

When interpreting a statute, the Court "begins with the text chosen by Congress," while considering "the specific context in which that language is used, and the broader context of the statute as a whole." *Romano-Murphy v. Comm'r*, 816 F.3d 707, 714–15 (11th Cir. 2016) (citations omitted). Section 611 is a criminal statute. It sits not in Title 8 of the United States Code, "Aliens and Nationality," but in Title 18, "Crimes and Criminal Procedure." *See* 18 U.S.C. § 611; *Pulsifer v. United States*, 601 U.S. 124, 141 (2024) (looking to statute's "legal context" to ascertain its meaning). The statute says:

> It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate,

[21] *See, e.g.*, Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 58 (1868) ("The rule applicable here is, that *effect is to be given, if possible, to the whole instrument,* and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory. This rule is especially applicable to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers of the delegated, leaving as little as possible to implication.") (emphasis in original); *Gibbons v. Ogden*, 22 U.S. 1, 71 (1824) (Marshall, C.J.) ("As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.").

> Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless —
>
> (1) the election is held partly for some other purpose;
>
> (2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and
>
> (3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

18 U.S.C. § 611(a). It continues, "[a]ny person who violates this section shall be fined under this title, imprisoned not more than one year, or both." *Id.* § 611(b). The "unless" clause in Section 611(a) carves from the statute's ambit aliens who vote in an election for state or local office, so long as voting for the non-federal office is "conducted independently of" voting for the federal office. *Id.* § 611(a)(1)–(3).

The statutory text of Section 611, and especially its "unless" clause, makes it exceedingly difficult to read the statute as anything but a nationwide ban on non-U.S. citizen voting. The "unless" clause, rightly described by *amicus* as "the most damning textual evidence of Congress' overambitious intent," [ECF No. 46 at 37], shows that Congress clearly meant to prohibit an alien from voting in a federal election even when permitted by state law. Look again at the statute: Section 611 explicitly makes it unlawful for an alien to vote in a federal election, except for state-authorized alien voting in a non-federal election. That textual exception makes it clear beyond peradventure that Congress intended to prohibit alien voting in federal elections—even if such voting was expressly authorized by state law. Section 611 makes it a crime for a certain class of people (non-citizens) to vote in any

election where a federal office is on the ballot. To that extent, the statute dictates "who may vote."[22] *ITCA*, 570 U.S. at 16.

## IV. None of Congress's Enumerated Powers Authorize It to Enact Section 611

The Court now turns to whether, despite the Voter Qualification Clauses, any of Congress's enumerated powers authorize it to enact Section 611.

The federal government "is acknowledged by all, to be one of enumerated powers," *M'Culloch v. State*, 17 U.S. 316, 405 (1819), meaning "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution," *United States v. Morrison*, 529 U.S. 598, 607 (2000). The Necessary and Proper Clause authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution" those powers. U.S. Const. art. I, § 8, cl. 18. "[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute," the Court must ask "whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 560 U.S. 126, 134 (2010). "[I]n addition to being authorized by" the Necessary and Proper Clause, a federal statute "must also 'not [be] prohibited' by the Constitution." *Id.* at 135 (quoting *M'Culloch*, 17 U.S. at 421) (alteration in original).

The Government raises two enumerated powers that might authorize Section 611: Congress's power over immigration and foreign affairs and its power under the Elections Clause. But neither does the trick.[23]

---

[22] It is also telling that Section 611 works just like Florida's voter qualification laws. Section 104.15, Florida Statutes—also a criminal law—says "[w]hoever, knowing he or she is not a *qualified elector*, willfully votes at any election is guilty of a felony of the third degree." (emphasis added). And the Florida Legislature chose to define a "qualified elector" as "a citizen of the United States," among other things. § 97.041(1)(a)2., Fla. Stat.

[23] The Government has intimated that the Fourteenth and Fifth Amendments might authorize Congress to pass Section 611, [*see* ECF No. 51 at 5 n.1], but it hasn't developed that argument—likely because of the dearth of authority to support such a position. *See, e.g., Johnson v. Bredesen*, 624 F.3d 742,

### A. Congress's Immigration and Foreign Affairs Powers Do Not Authorize It to Pass Section 611

The Government first argues Section 611 can be "sustained on the basis of Congress's broad authority over immigration and foreign affairs," which empowers Congress to legislate against "[f]oreign interference in elections." [ECF No. 51 at 8–9]. Analogizing to Justice Stewart's opinion in *Oregon v. Mitchell*, the Government submits that Section 611 is appropriately limited to addressing foreign interference in elections—"a particular problem clearly within the purview of congressional authority," [*id.* at 8 (quoting *Mitchell*, 400 U.S. at 292)]—and that the States "are not equipped to handle matters of immigration or foreign affairs and are not well situated to assess the extent to which foreign countries may be attempting to influence federal elections," [*id.* at 9]. Cox acknowledges the breadth of Congress's authority over immigration and foreign affairs but disagrees that Section 611 is a necessary and proper means of executing that authority. [*See* ECF No. 42 at 4–15]. She argues the statute is best read instead as an unconstitutional voter qualification law. [*Id.* at 6–7].

Congressional authority over immigration and foreign affairs is broad indeed. The Supreme Court has said "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens," *Arizona v. United States*, 567 U.S. 387, 394 (2012), which "derives from various sources, including the Federal Government's power to establish a uniform Rule of Naturalization," "its power to regulate Commerce with foreign Nations," "and its broad authority over foreign affairs," *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (citations omitted) (cleaned up). The Supreme Court has said that "any policy toward aliens is vitally and intricately interwoven with

---

752 (6th Cir. 2010) ("[N]o authority recognizes the right to vote in federal elections as a privilege or immunity of United States citizenship. Indeed, dicta in several historical Supreme Court cases suggest the opposite.") (citing *Minor*, 88 U.S. at 178; *Pope*, 193 U.S. at 632); *see also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) ("[T]his Court has often noted that the Constitution 'does not confer the right of suffrage upon any one,' . . . , and that 'the right to vote, *per se*, is not a constitutionally protected right.'") (first quoting *Minor*, 88 U.S. at 178; and then quoting *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973)).

contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). And certainly, the States' authority to regulate matters of immigration and foreign affairs is limited. *United States v. Texas*, 599 U.S. 670, 711 (2023) (Alito, J., dissenting); *see also Zschernig v. Miller*, 389 U.S. 429, 436 (1968) (holding statute providing for escheat of non-citizen property unconstitutional and noting "[t]hat kind of state involvement in foreign affairs and international relations . . . the Constitution entrusts solely to the Federal Government").

As the Government urges, Congress clearly has authority under its immigration and foreign affairs powers (as well as its Elections Clause powers) to legislate against foreign interference in federal elections. *See United States v. Singh*, 979 F.3d 697, 710 (9th Cir. 2020) (finding "[a] prohibition on campaign donations and contributions by foreign nationals is necessary and proper to the exercise of the immigration and foreign relations powers"). *Cf. Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 422–23 (2010) (Stevens, J., concurring) ("[W]e have never cast doubt on laws that place special restrictions on campaign spending by foreign nationals.") (citing 2 U.S.C. § 441e(a)(1)). The Government insists the Court should read that power as authorizing Section 611. [ECF No. 51 at 8–9]. Two problems, however—one surface-level, the other deeper—defeat that position.

The first problem with the Government's argument is the plain language of Section 611. [*See* ECF No. 51 at 8–9]. As we have seen, Section 611 has the effect of setting a voter qualification in federal elections, *see supra* Section III—and it appears to do nothing else. Section 611's "unless" clause omits from the statute's ambit certain state and local elections. 18 U.S.C. § 611(a)(1)–(3). That intentional omission is, as *amicus* argues, "damning textual evidence" that the statute is a voter qualification law and nothing more. [ECF No. 46 at 37]. If Congress really intended the statute as an exercise of its plenary authority over aliens, there's no reason it would have cleaved off non-federal elections. Congress also chose to draft a statute that mirrors the States' voter qualification laws.

*Compare, e.g.*, 18 U.S.C. § 611, *with* § 104.15, Fla. Stat. As *amicus* points out, [ECF No. 46 at 31–33], if Congress's aim was to prevent aliens from voting illegally, it could have simply drafted Section 611 to penalize violations of the States' voter qualification laws rather than establish its own. This Court agrees with *amicus* that it would "be difficult to identify a constitutional flaw in a federal statute that made it a federal crime for an alien to vote in a federal election in violation of a voter qualification set by the states." [*Id.* at 34–36]; *see Smiley v. Holm*, 285 U.S. 355, 366–67 (1932) (Congress may impose "additional penalties for the violation of the state laws"); *Burroughs v. United States*, 290 U.S. 534, 547 (1934) (noting that "[t]he power of Congress to protect the election of President and Vice President from corruption [is] clear"). *Amicus*'s hypothetical statute appears to pass muster easily under every constitutional provision we have been discussing.

But Congress didn't do that with Section 611—and the difference matters. Imagine for a moment that the State of Florida decided tomorrow to enfranchise non-citizens. *Amicus*'s hypothetical statute—the one tethered to a violation of state law—would not be triggered, respecting the State's choice. But Section 611, even if Florida decided otherwise, still looms as a standalone federal prohibition on non-citizen voting, clearly running afoul of the Voter Qualification Clauses.

This might seem like much ado about nothing (or too much ado about drafting)—after all, the idea that a State today would legalize non-citizen voting in a federal election seems far-fetched. But as Cox and *amicus* observe, the States have exercised their constitutional authority to set voter qualifications by allowing (or forbidding) non-citizen voting since our earliest days as a republic. [ECF Nos. 30 at 4–5; 46 at 3–11, 21–26]. In 1800, "[a]ll thirteen original states offered noncitizens some form of suffrage." Alan H. Kennedy, *Voters in a Foreign Land: Alien Suffrage in the United States, 1704–1926*, 34 J. Pol'y Hist. 245, 252 (2022). After the War of 1812, and amidst rising suspicion of non-citizens, many States reversed course and eliminated non-citizen voting. *See* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 27 (rev. ed. 2009). The tides then

shifted again in the wake of the Civil War, as upstart frontier States—including Florida—offered non-citizens the right to vote, in part to encourage settlement and in part because "it was seen as only fair to grant the vote" to Civil War veterans who were not citizens. Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1409–14 (1993). The States have largely prohibited non-citizen voting since 1926, [*see* ECF No. 46 at 11 (citing Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 Am. Pol. Sci. Rev. 114 (1931))], so one could perhaps argue Congress only intended Section 611 to criminalize violations of a more-recently-settled tradition in the States, rather than to establish a standalone federal voter qualification. But "no tradition"—however well settled—"can supersede the Constitution." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 96 n.1 (1990) (Scalia, J., dissenting). *Cf. NLRB v. Noel Canning*, 573 U.S. 513, 571 (2014) (Scalia, J., concurring in the judgment) ("Of course, where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision . . . . But past practice does not, by itself, create power.") (citations omitted) (cleaned up).

Which brings us to the second, deeper problem with Section 611. The Voter Qualification Clauses are a foundational limit on federal authority, motivated by "the Framers' aversion to concentrated power." *ITCA*, 570 U.S. at 17; *see supra* Section II. They address the issue of voter qualifications with specific language, while the immigration and foreign affairs clauses are drafted more broadly. *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 804 (2025) (Thomas, J., dissenting) ("When reading two legal texts together, the 'specific controls' over the 'general.'") (quoting *Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335–36 (2002)). *Compare* U.S. Const. art. I, § 2, cl. 1; *id.* amend. XVII; *id.* art. II, § 1, cl. 2, *with id.* art. I, § 8, cls. 3–4.

While this case presents an issue of first impression, the Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), is instructive. *Seminole Tribe* involved a constitutional

challenge to a provision of the Indian Gaming Regulatory Act ("IGRA") that gave the tribes a federal cause of action against a State if the State failed to negotiate a gaming compact. *Id.* at 49. Noting "the Eleventh Amendment's role as an essential component of our constitutional structure," the Supreme Court found the IGRA provision unconstitutional because it breached the States' sovereign immunity—notwithstanding Congress's conceded plenary authority over Indian affairs. *Id.* at 56, 72 (citation omitted). Our case is of course governed by the Voter Qualification Clauses, which have received less judicial attention than the Eleventh Amendment. *But see Mitchell*, 400 U.S. at 118; *ITCA*, 570 U.S. at 16–20. But *Seminole Tribe* still underscores a basic principle that guides the Court's decision today: Foundational constitutional limits do not give way, even to capacious general provisions of enumerated congressional power.

The Court finds no reason to conclude that an exercise of Congress's "plenary powers" over immigration and foreign affairs would override the "foundational constitutional constraints" set out in the Voter Qualification Clauses. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 276 n.3 (2023); *id.* at 276 ("Still we have never wavered in our insistence that Congress's Indian affairs power is not absolute. . . . It could not be otherwise—Article I gives Congress a series of enumerated powers, not a series of blank checks. Thus, we reiterate that Congress's authority to legislate with respect to Indians is not unbounded. It is plenary within its sphere, but even a sizeable sphere has borders.") (cleaned up); *id.* at 374 (Alito, J., dissenting) ("[E]ven so-called plenary powers cannot override foundational constitutional constraints. By attempting to control state judicial proceedings in a field long-recognized to be the virtually exclusive province of the States, ICWA violates the fundamental structure of our constitutional order.").

**B. The Elections Clause Does Not Empower Congress to Pass Section 611**

Next, the Government argues the Elections Clause empowers it to "protect the integrity of federal elections," and that Section 611 does just that. [ECF No. 32 at 2 (citing *Smiley*, 285 U.S. at

366–67)]. Cox acknowledges Congress has the authority under the Elections Clause to protect against voter fraud but argues Section 611 goes too far by banning an entire class of people from voting. [ECF No. 34 at 2–3]. The Elections Clause, she argues, does not contain an implied license for Congress to regulate voter qualification, both because of its plain language and because the Voter Qualification Clauses already commit that authority to the States. [ECF No. 30 at 8–10].

The Elections Clause says: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. "[T]he Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" *ITCA*, 570 U.S. at 9 (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)).[24] So while the Voter Qualification Clauses expressly commit to the States the power to decide *who* votes in federal elections, *see supra* Section II, the Elections Clause gives the federal government final say over *how* those elections are run, *see Siebold*, 100 U.S. at 392 (holding that Congress's power under the Elections Clause "is paramount, and may be exercised at any time, and to any extent which it deems expedient"); *ITCA*, 570 U.S. at 14–15 ("[T]he States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it terminates according to federal law.") (citations omitted) (cleaned up).

The Government's argument stretches the Elections Clause well past its clear textual limits. As the Supreme Court wrote in *ITCA*, "[o]ne cannot read the Elections Clause as treating implicitly what [the Voter Qualification Clauses] regulate explicitly." 570 U.S. at 16. The power to regulate the

[24] While Article II, § 1, cl. 2, which addresses Presidential elections, does not contain a similar provision, the Supreme Court has said the federal government's broad power over the mechanics of congressional elections extends to Presidential elections. *See Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995) (citing *Burroughs*, 290 U.S. at 545).

"mechanics" of federal elections and the power to decide who may vote in those elections are, as we have seen, meaningfully different in our constitutional order. *Id.* at 9; *see also id.* at 17 ("Prescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government' by the Elections Clause, which is 'expressly restricted to the regulation of the *times*, the *places*, and the *manner* of elections.'") (quoting The Federalist No. 60, at 371 (A. Hamilton)) (emphasis in original). And while it is certainly true that Congress has authority under the Elections Clause to pass laws to prevent voter fraud in federal elections, the Government presents no evidence that Section 611 is designed to further that end. *See The Ku Klux Cases*, 110 U.S. 651, 661 (1884) ("Can it be doubted that congress can, by law, protect the act of voting, the place where it is done, and the man who votes from personal violence or intimidation, and the election itself from corruption or fraud?"); *United States v. Saylor*, 322 U.S. 385, 392 (1944) (Douglas, J., dissenting) ("Congress has ample power to legislate in this field and to protect the election of its members from fraud and corruption.").

## V. 18 U.S.C. § 611 Is Unconstitutional as Applied to Cox

The Court does not set aside the application of a statute passed by Congress lightly, so let's end by underscoring what this unusual case does *not* decide or even touch upon:

1. Can the State of Florida prohibit and punish the exact conduct Defendant Cox allegedly engaged in here? This has already been decided elsewhere and is not addressed here: Florida can and does. *See* §§ 97.041(1)(a)2., 104.011, 104.15, Fla. Stat.; U.S. Const. art. I, § 2, cl. 1; *id.* amend. XVII; *id.* art. II, § 1, cl. 2.

2. Does the federal government have the power to *remove* the Defendant from the United States for engaging in the exact conduct alleged here? The undersigned must wait for a live case, but a different federal statute, embedded in Title 8, states that "[a]ny alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is inadmissible." 8 U.S.C. § 1182(a)(10)(D)(i). That statute on its face rests on Congress's immigration power and does

not depend upon setting a federal voting qualification.[25] This case doesn't address the Government's power to remove a non-U.S. citizen who engages in the same conduct.

3. Perhaps most importantly, could Congress draft an enforcement statute (including one with criminal penalties) that supports a State's decision to prohibit non-citizen voting in federal elections? [*See* ECF No. 46 at 34–36 (setting forth hypothetical statute that made it a federal crime for an alien to vote in a federal election in violation of a voter qualification set by a State)]. While the Court must wait for a live case or controversy with a real statute, a review of the legal authorities cited in this Memorandum Opinion suggests that such a hypothetical statute would be a very different kettle of fish. *See Smiley*, 285 U.S. at 366–67; *Burroughs*, 290 U.S. at 547.

But the Court in this rare case is presented with the actual text of Section 611. And our Constitution does not allow the federal government to prosecute Cox under that statute for voting in a federal election. To hold otherwise would violate the careful balance of powers explicitly erected by the People who framed and ratified our great Charter. To hold otherwise would allow Congress to establish and modify the parameters of *its own special electorate*, entirely divorced from what Florida or any other State may decide. That result is *precisely* what our federal constitutional republic does not allow. Justice Harlan and Justice Scalia saw what is obvious from one short sitting with our Constitution and all the original material we have about its meaning: words cannot be clearer. *See*

---

[25] As one further illustration of this, the Eleventh Circuit in *Wood v. U.S. Attorney General*, 853 F. App'x 475 (11th Cir. 2021), was careful in denying a petition for review of a decision of the Board of Immigration Appeals. While the Court respects that *Wood* is unpublished and therefore non-precedential, a reading of the decision in *Wood* indicates that the result would not be any different if Section 611 was held to be unconstitutional as applied against a charged criminal defendant. Other published cases that have upheld removal based on Section 611 were not presented with the issue of congressional authority; while the Court must wait for a live case or controversy, there is much within these cases that suggests the result does not rise or fall upon Section 611. *See, e.g.*, *Kimani v. Holder*, 695 F.3d 666 (7th Cir. 2012) (Easterbrook, C.J.); *Fitzpatrick v. Sessions*, 847 F.3d 913 (2017) (Easterbrook, C.J.).

*ITCA*, 570 U.S. at 16–17, 16 n.8 (Scalia, J.) (citing *Mitchell*, 400 U.S. at 210–12 (Harlan, J., concurring in part and dissenting in part)).

For the above reasons, the Court concludes that 18 U.S.C. § 611 is unconstitutional as applied to Cox. The charge against her must be dismissed.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss Based on Unconstitutionality of 18 U.S.C. § 611 **[ECF Nos. 30, 47]** is **GRANTED**.

2. The Information **[ECF No. 1]** is **DISMISSED**.

3. All other pending motions are **DENIED as MOOT**, and all other pending deadlines are **TERMINATED**. Any scheduled hearings are **CANCELLED**.

4. Any outstanding conditions of pretrial release are **VACATED**, and the personal surety bond is **TERMINATED.**

**DONE AND ORDERED** in the Southern District of Florida on October 1, 2026.

DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc: counsel of record